IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 2 8 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

LAURA DENISE HATCHER,

       Plaintiff,

v.

KAISER PERMANENTE INSURANCE
COMPANY; BUCILLA PETROSS;
CRYSTAL STOKES,

       Defendants.

CIVIL ACTION
NO. 1:07-cv-2679-GET

O R D E R

The above-styled matter is presently before the court on defendants' motion for summary judgment [docket no. 61].

On October 26, 2007, plaintiff filed this action against Kaiser Permanente Insurance Company, Bucilla Petross, Crystal Stokes and Michelle Robinson (the "Kaiser defendants") alleging interference and retaliation pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* On November 29, 2007, defendants filed their answer to the complaint.

On March 28, 2008, the court issued an order granting plaintiff's motion for extension of time until May 16, 2008 to respond to defendants' discovery requests due to plaintiff's health problems. The court also granted defendants' request to extend the discovery period until June 28, 2008.

Also on March 28, plaintiff filed a motion to amend her complaint to assert additional claims against the Kaiser defendants

and to assert claims against the additional defendants of Northside Hospital and Nancy Corbin.

On May 14, 2008, the court issued an order granting plaintiff's motion to amend to the extent she sought to allege additional claims against the Kaiser defendants and denying the motion to amend with regard to adding claims against new defendants Northside Hospital and Corbin.

On June 28, 2008, plaintiff filed a motion to extend discovery until September 28, 2008 "to allow more time for Plaintiff to efficiently complete the discovery process...." On August 4, 2008, this court granted the motion to extend discovery until September 28, 2008 but advised the parties that no further extensions would be granted.

On September 2, 2008, plaintiff filed a motion to compel discovery responses from defendants. On September 11 and 15, 2008, plaintiff filed supplemental briefs in support of her motion to compel. On September 24, 2008, plaintiff filed a motion for extension of time to complete discovery. On October 20, 2008, defendants filed a motion for summary judgment. Plaintiff requested an extension of time to respond to the motion for summary judgment on October 31, 2008.

On April 15, 2009, the court issued an order denying plaintiff's motion to compel and motion for extension of time to complete discovery, as well as defendants' request for attorney's

fees. The court granted plaintiff's motion for an extension of time for a period of twenty days to respond to defendant's motion for summary judgment. Plaintiff filed her response to the motion for summary judgment on May 5, 2009 and defendants filed their reply on May 20, 2009. Therefore, defendants' motion for summary judgment is now ripe for consideration.

Standard

Courts should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party must "always bear the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). That burden is 'discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325; see also U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991).

Once the movant has met this burden, the opposing party must then present evidence establishing that there is a genuine issue of material fact. Celotex, 477 U.S. at 325. The nonmoving party must

go beyond the pleadings and submit evidence such as affidavits, depositions and admissions that are sufficient to demonstrate that if allowed to proceed to trial, a jury might return a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). If he does so, there is a genuine issue of fact that requires a trial. In making a determination of whether there is a material issue of fact, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Id. at 255; Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987). However, an issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. Id. at 248. Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element. Celotex, 477 U.S. at 323.

## Facts

In light of the foregoing standard, the court finds the following facts for the purpose of resolving this motion for

summary judgment only. As an initial matter, the court notes that plaintiff did not provide her response to defendants' statement of material facts in the format required by the Local Rules. See LR 56.1B(2)a(1), NDGa (requiring "individually numbered, concise, nonargumentative responses...."). Nevertheless, the court has considered the "Declaration of Laurie Denise Hatcher in Response to Statement of Material Facts and In Opposition to Defendants' Summary Judgment Motion" to the extent the statements are responsive to defendants' statement of material facts.

Kaiser is a healthcare organization. Crystal Stokes works for Kaiser as the Assistant Director of Regional Supplemental Staffing. Bucilla Petross works for Kaiser as the Director of Supplemental Staffing. Plaintiff is a former employee of Kaiser. From April 2001 until her termination, plaintiff reported to Stokes and Petross.

Plaintiff was hired by Kaiser as a Registered Nurse in the After Hours Department on January 25, 1997. When plaintiff began work with Kaiser, she attended orientation at the regional office and received a copy of the Principals of Responsibility handbook, which contains Kaiser's equal employment and anti-harassment policies. Plaintiff received updated copies of the handbook and policies in 2003, 2004, 2006, and 2007, and signed acknowledgments to that effect.

In 1998, plaintiff transferred into the Supplemental Staffing Department as a Registered Nurse. The Supplemental Staffing Department provides replacement staff to fifteen different Kaiser medical offices throughout the metropolitan Atlanta area.

In May 2001, plaintiff transferred to the Advice/Charge nurse position in the same department. As a Charge/Advice Nurse, plaintiff was responsible for the day-to-day operations of the team, overseeing the support staff, insuring smooth operations of the team, dealing with issues or concerns with patients, providers and staff, providing coverage and support for the staff, assisting with walk-ins, triaging patients, and working in the advice room to provide telephone advice to members. Plaintiff typically worked from 8:00 a.m. to 5:00 p.m. Plaintiff traveled to different Kaiser facilities depending on the needs of the company. In April 2001, Stokes became the Assistant Director of Supplemental Staffing and Plaintiff's direct supervisor.

In 2004, plaintiff needed brain surgery to correct an aneurism. Plaintiff requested and received a medical leave of absence to undergo the procedure. After the leave expired, Kaiser reinstated plaintiff to her position as an Advice/Charge Nurse in the Supplemental Staffing Department working for Stokes and Petross, with the same pay and benefits. Upon her return, plaintiff was not subjected to any form of disciplinary action.

Plaintiff requested and Kaiser granted a paid medical leave of absence from January 2, 2005 to March 10, 2005. Plaintiff returned to work from that leave on February 14, 2005 without any changes to the terms and conditions of her employment.

Plaintiff requested ten weeks of leave pursuant to the Family Medical Leave Act ("FMLA") from approximately October 23, 2006 to January 2, 2007. Kaiser granted this request. Plaintiff returned to work on January 2, 2007 without any changes to the terms and conditions of her employment.

In January 2007, plaintiff had utilized eleven weeks of her FMLA leave, leaving her eligible for only one more week of FMLA leave through October 2007. In March 2007, plaintiff requested and received her last week of FMLA leave which expired on April 1, 2007.

Although Plaintiff had exhausted all available leave under the FMLA, Kaiser allowed plaintiff to take six additional weeks of non-FMLA leave to recover from a hip replacement procedure. On April 30, 2007, plaintiff returned from her non-FMLA leave of absence and Kaiser reinstated plaintiff to her position with the same pay and benefits.

In July 2007, plaintiff requested six more weeks of medical leave from August 1, 2007 to September 12, 2007 due to a brain aneurism surgery. At that time, plaintiff did not have any FMLA leave remaining, but defendant allowed plaintiff to take the

requested time off and even extended the leave by approximately four weeks. Plaintiff returned from her non-FMLA leave of absence on October 8, 2007. Plaintiff contends that "Stokes and Petross' attitude toward [plaintiff] changed drastically in October 2007."

The KP HealthConnect system, implemented in approximately 2005/2006, is the electronic member health information system that allows access to member health information, lab results, test results, and a place for the providers and nursing staff to document member health information. The system also is used to document members' or health care providers' complaints about any advice given by the telephone advice nurse.

In April/May 2007, defendant upgraded the KP HealthConnect system, changing over from the ".ti note program" to the ".gen advice note program" (".gen advice"). After the upgrade, Advice Nurses used .gen advice to document the calls from patients and to triage the patients. Although Kaiser upgraded .gen advice, all of the other protocols remained the same: accessing the system, interacting with the members over the phone, and logging into the computer system.

Defendant provided an overview presentation to all Advice Nurses explaining the .gen advice upgrade, and also offered hands on training to the Advice Nurses on .gen advice. Plaintiff participated in receiving an overview of the .gen advice upgrade, however, plaintiff claims that she was never offered the

opportunity to have a HealthConnect training specialist to assist her one-on-one.

Defendant made KP HealthConnect specialists available in the various facilities and by telephone to address technical questions that any of the Advice Nurses had regarding the new .gen advice. According to plaintiff, however, Kaiser did not make KP Health Connect specialists available to her.

Plaintiff was scheduled to return from non-FMLA leave on October 8, 2007 and was assigned to work at the Cumberland OB/GYN department. Plaintiff was surprised that she was not returned to her former location in the Surgery Department because it was plaintiff's understanding that her supervisor there, Daria Brannon, had made a special request for plaintiff to be reassigned there.

Because plaintiff had been on non-FMLA leave when .gen advice was implemented, Stokes decided to assign preceptors to work with Plaintiff to train her on the new program and to ensure patient safety. The preceptors were full-time Advice Nurses responsible for sitting with Plaintiff during calls to make sure that she was comfortable with the new .gen advice system. Plaintiff contends that "these telephone advice nurses were not interested in helping me and did not like interrupting their regular duties to answer my questions. It was a very harassing and humiliating experience overall."

Plaintiff, however, does not think that assigning her a preceptor when she returned from her leave was discriminatory. Plaintiff believes that the "manner in which these preceptors were allowed to treat [her]...was discriminatory."

As a matter of course, the preceptors provide written feedback to the supervisor of the individual they are assisting. Prior to 2007, plaintiff herself worked as a preceptor and she also provided feedback on the individuals she assisted.

On October 9, 2007, the first preceptor assigned to work with plaintiff at the Cumberland OB/GYN Department was Michelle Robinson. Robinson provided a statement to Stokes that plaintiff spent over 30 minutes on the phone with the patient, plaintiff kept placing the patient on hold to ask questions, plaintiff forgot which complaint went with which patient, plaintiff called the patients back to clarify their complaints, plaintiff appeared to forget that she completed some parts of the notes and repeatedly rechecked her notes after sending them.

According to defendant, the average length of a patient call should be five to seven minutes. Calls lasting longer than this prevent the Advice Nurses from answering other member calls in the queue (which could be of a serious nature), limit the number of calls the Advice Nurse can take (thus limiting productivity), and hinder the efficient patient service that Kaiser strives to provide.

On October 10, 2007, Norma Chao worked as plaintiff's preceptor in the Cumberland OB/GYN department. Like Robinson, Chao provided a statement to Stokes that indicated plaintiff placed a member on hold to get further instructions on how to operate the system, that she frequently repeated instructions to plaintiff, that plaintiff sometimes called patients back to verify information and that some of plaintiff's calls lasted up to 30 minutes.

On October 12, 2007, Clinical Supervisor Julie Oliver provided a statement to Stokes explaining that Robinson informed her that plaintiff was not performing as an experienced Advice Nurse, plaintiff was placing the member on hold to ask the preceptor for assistance, calling members back to verify information she already gathered, asking the same question repeatedly, and that plaintiff's calls were taking more than thirty minutes. Placing members on hold each time that they ask a question and asking the same questions repeatedly to the members is not consistent with the quality care that Kaiser strives to provide its members and their families.

Stokes and Petross decided to talk to plaintiff about the negative feedback they received. On October 11, 2007, Stokes met with plaintiff to discuss her performance. Stokes told plaintiff that the preceptors had expressed concerns about plaintiff's ability to perform her job and that they felt she was not cooperating with their efforts to help her master the new program.

According to plaintiff, the preceptors had not pointed out previously anything she needed to do differently or that her performance was subpar. Plaintiff states that she felt she was being attacked when Stokes and Petross met with her.

Because concerns about plaintiff's performance had not been raised prior to October 2007, Stokes wanted clarification from plaintiff's doctor to ensure plaintiff was able to return to work with no limitations and perform her job duties as assigned. Stokes asked plaintiff to seek additional guidance from her surgeon. On October 17, 2007, in plaintiff's presence, Dr. Barrow called Stokes and told her that he released plaintiff from a surgery standpoint but if additional information was needed, plaintiff had to go to her primary care physician.

In an effort to help plaintiff address some of the concerns raised by the preceptors, Stokes asked plaintiff to attend a half day advice documentation training at the regional office. Plaintiff appreciated the opportunity to get some additional help with the .gen advice system.

After this training, Stokes assigned plaintiff to the Cumberland OB/GYN Department to work with a preceptor. On October 22, 2007, Oliver gave a statement to Stokes indicating that she had concerns about plaintiff being on advice without a preceptor monitoring her because plaintiff was having difficulty handling calls and was having difficulty with organization and focus. That

same day, Chao gave a statement to Stokes that plaintiff repeated multiple times that her phone did not work but continued to try to make phone calls, placed the member on hold after each question she asked and frequently attempted to call the members back after she completed each phone encounter. Also on that day, another preceptor, Frances Cruz, informed Stokes that plaintiff consistently asked the same questions of the patients and staff.

After receiving the complaints from Oliver, Chao, and Cruz, Stokes and Petross decided to talk to plaintiff again to discuss her performance. Specifically, Stokes told plaintiff that preceptors raised concerns about her memory loss, the fact that she seemed incoherent about how to respond to member questions, she was calling patients back repeating information given and verifying information already obtained, she was confusing which complaints went with which patients, she was forgetting what parts of the notes she had already completed, she was repeatedly rechecking notes after sending them which led to lengthy phone interactions, she failed to follow instructions or directives, and she repeatedly informed everyone that she had four brain surgeries. Stokes also counseled plaintiff that she took too long to input the advice into the computer system.

Because Dr. Barrow's release was only from a surgery standpoint, Stokes gave plaintiff a letter asking plaintiff to get

an opinion from her primary care physician, as suggested by Dr. Barrow during the call with plaintiff.

Plaintiff visited her primary care physician, Dr. Robert Hibler, on October 29, 2007 and he released her to return to work on October 30, 2007. Immediately after Dr. Hibler released plaintiff to return to work, Stokes assigned plaintiff to work at the Regional Call Center. The Call Center handles "overflow of calls," calls originally directed at medical offices that could not be addressed by the Advice Nurses at the particular office. Kaiser assigned Wanda Terrell and Carolyn Lipscomb as preceptors to help plaintiff at the Call Center.

On October 31, 2007, Terrell provided a statement to Stokes that plaintiff still needed more practice with navigating through the advice protocols. On November 1, 2007, Terrell provided handwritten notes to Stokes indicating that she did not feel that plaintiff was ready to work independently and that plaintiff needed more training to decrease the overall length of her calls, which continued to average about 30 minutes each. On November 2, 2007, Lipscomb provided a statement to Stokes that plaintiff was unsafe to give phone advice, was having a hard time opening and navigating through the encounters, acted like a brand new nurse, had to be told the same thing over and over again, was having a hard time managing calls, needed a lot more training before being left on the phones alone, and did not want to accept constructive criticism.

On November 5, 2007, Terrell informed Stokes that she did not feel that plaintiff was safe to take calls or give advice, was still extremely slow in documenting her calls, was having major problems navigating through the advice protocols, still needed to be prompted to open the encounter and move through the encounter, was functioning at the level of a new nurse who had never been exposed to telephone triage and that a few members became agitated during plaintiff's calls.

On November 5, 2007, Call Center Supervisor, Kerana Lee, provided a statement to Stokes claiming plaintiff hung up on a chest pain call because she could not get the encounter opened in a timely manner. Plaintiff, however, claims that if this happens it was never brought to her attention.

On November 7, 2007, Terrell provided another statement to Stokes that Plaintiff was still struggling to open the encounters and navigate through them, and that plaintiff still had to be prompted every step of the way. The Call Center Director, Tim Abbott, shared with Stokes the feedback he received from the preceptors and the clinical supervisor, as well as his own observations of plaintiff's performance. Abbott informed Stokes that plaintiff appeared to be having a difficult time grasping the new system, and that the preceptors at the Call Center were frustrated. Abbott then asked Stokes to remove plaintiff from the Call Center. After Abbott asked that plaintiff be removed from

the Call Center, Stokes assigned plaintiff to the Gwinnett Internal Medicine Department because that Department had a sufficient number of Advice Nurses to assist plaintiff.

Following the concerns raised by Terrell, Lipscomb, Lee and Abbott, Stokes and Petross decided to issue plaintiff a verbal warning. On November 8, 2007, Stokes and HR Manager Brenda Lopez-Taylor met with plaintiff and issued her a verbal warning, which Lopez-Taylor read line by line. The warning noted that Stokes had received feedback from five different preceptors, two supervisors, and two directors who observed her performance and that the Company had concerns about plaintiff's ability to independently perform the primary responsibilities of her job as an Advice Nurse. The verbal warning outlined the preceptors' complaints that plaintiff (1) does not following instructions; (2) asked the same questions repeatedly; (3) was repeating the same information to members; (4) had difficulty navigating through the computer system; (5) took too long on each patient call; (6) needed to be prompted to respond to the member; and (7) needed constant supervision and prompting.

During this counseling meeting, Stokes provided plaintiff with a copy of the policies and procedures for Advice Nurses and set forth the expectations of plaintiff's job. Plaintiff protested to the feedback, claiming the preceptors told her she was doing fine.

Lopez-Taylor reminded plaintiff that the preceptors (who did not share their written feedback or the feedback forms with

plaintiff) were not responsible for sharing their concerns with plaintiff and that it was Stokes' job, as her supervisor, to tell plaintiff about their concerns. Stokes then informed plaintiff that she would continue working with a preceptor, that her progress was going to be monitored on a daily basis, and that plaintiff would receive weekly feedback. Although plaintiff did not have a problem with Stokes monitoring her performance, plaintiff felt like she was being harassed and told Stokes that she was going to get an attorney because she felt like she was being picked on. After the meeting, plaintiff called Human Resources and said she was being "harassed" by her supervisors, but she did not elaborate on the claim or suggest that the alleged harassment was based on any protected category. After plaintiff received the verbal warning, she was not fired or demoted and her pay was not changed.

On November 9, 2007, Terrell provided another statement to Stokes that plaintiff still required much assistance with everything in general. In a continued effort to help plaintiff address some of the ongoing concerns raised by the preceptors, on November 16, 2007, Stokes asked plaintiff to once again attend advice documentation training.

While assigned to the Gwinnett facility, plaintiff reported to Deborah Gayles and worked with the following preceptors: Caroline Conduah; Pam Pomar; Carol Patterson; and Mary Rice. On November 19, 21, 23, and 26, 2007, Pomar provided Stokes with

Supplemental Staffing Department Performance Feedback Forms evaluating plaintiff's performance and noting that plaintiff was taking too much time on some calls, was asking too many questions, and needed improvement or was unsatisfactory in many of the categories on the Feedback Forms.

On November 27, 2007, Gayles sent two emails to Stokes indicating that plaintiff's "'not ready time' was huge," as plaintiff was putting the phone on hold for long periods of time while she was taking calls. "Not ready time" is time that the Advice Nurse places a call on hold so that the member cannot hear the Advice Nurse typing or talking. Each time that a call is placed on "not ready" counts against the statistics for the facility.

Following the concerns raised by Pomar and Gayles, Stokes and Petross decided to issue plaintiff a written warning. On November 27, 2007, Stokes and Lopez-Taylor met with plaintiff and issued her a written warning. The warning noted that plaintiff was (1) not accessing advice guidelines consistently, (2) taking too long to document and finish advice calls, (3) not meeting advice quality standards, 4) having difficulty navigating through the system, 5) using the .ti advice note instead of the .gen advice note, 6) needing constant supervision and reassurance to do her job, 7) not following instructions given to her nor remembering the information given to her, 8) frequently asking the same questions, and 9) not

demonstrating critical thinking. The written warning indicated that plaintiff's progress was going to be monitored on a daily basis, and she was going to receive feedback regarding her performance on a weekly basis.

On December 3 and 4, 2007, Conduah provided Stokes with Feedback Forms stating that plaintiff was making multiple calls to patients to get information and noting that plaintiff needed improvement in many of the categories on the Feedback Forms. On December 5 and 6, 2007, Patterson provided Stokes with Feedback Forms on plaintiff's performance indicating that plaintiff needed improvement or was unsatisfactory in many of the categories on the Feedback Forms. On December 5, 2007, Gayles sent an email to Stokes relaying Conduah's concerns with plaintiff's performance, stating that plaintiff acted as if .gen advice was new to her, was very slow taking calls, was using "not ready time" too much, needed a lot of practice with documenting, and needed to stop talking over the patients. Later that same day, Gayles sent another email to Stokes relaying Patterson's concerns with Plaintiff's performance, indicating that plaintiff could not take constructive criticism at all, appeared overwhelmed at times, could not seem to get the process of documenting the calls, looked to the preceptor for what to do next, could not open the encounters, placed members on hold, and required constant reassurance. On December 6, 2007, Gayles sent another email to Stokes relaying Patterson's additional

concerns stating that plaintiff could not take constructive criticism, continued to ask questions to which she should have known the answers, and looked to the preceptors for answers all day.

Following the concerns raised by Conduah, Patterson, and Gayles, stokes and Petross decided to issue plaintiff a final written warning. On December 6, 2007, Stokes and Lopez-Taylor met with plaintiff and issued her a final written warning, which they read line by line. The final written warning indicated that plaintiff was 1) not accessing .gen advice consistently, 2) not documenting and completing advice calls per advice documentation guidelines, 3) placing members on hold and making multiple call backs to members to obtain information, 4) having difficulty navigating through the system, 5) disrupting the operations of the team, and 6) needing constant guidance and reassurance to do her job. The final written warning indicated that plaintiff's progress was going to be monitored on a daily basis and she was going to receive feedback regarding her performance on a weekly basis. After receiving the final written warning, plaintiff requested, and Kaiser granted, a leave of absence from December 6, 2007 until December 21, 2007. According to plaintiff, after receiving that final warning on December 6, 2007, "the stress so aggravated [her] sickle cell that I went into a crises (sic) and had to be hospitalized."

On December 21, 24, 27 and 28, 2007, Conduah provided Stokes with Feedback Forms stating that plaintiff had difficulty navigating through health connect, needed work on call handle time, needed constant reminders in navigating through .gen advice, exhibited inappropriate behavior, stayed on "not ready time" for excessive lengths of time, and that plaintiff needed improvement or was unsatisfactory in many categories on the Feedback Forms. On December 26, 2007, Rice provided Stokes with a Feedback Form stating that plaintiff became distracted at times, made unnecessary comments that lengthened the processing time, and that plaintiff needed improvement in many of the categories on the Feedback Form.

On December 27, 2007, Gayles sent an email to Stokes and Petross stating that Plaintiff was "killing her on 'not ready time,'" was not taking many calls and still looked to the preceptor for direction. On December 28, 2007, Petross sent an email to Stokes relaying the serious concerns she received from Gayles and Conduah about plaintiff's performance.

Following the additional concerns raised by Conduah, Rice, and Gayles, Stokes and Petross concluded that plaintiff was not able to safely and effectively handle calls from Kaiser's members. On January 2, 2008, Stokes and Lopez-Taylor met with plaintiff and told plaintiff that she was being terminated because she was not performing her job. Following her termination, on January 2, 2008,

plaintiff's attorney filed an EEOC charge on plaintiff's behalf, but plaintiff did not verify the charge.

### Discussion

Plaintiff alleged that defendant and her previous supervisors violated the Family Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981 when it issued various disciplinary warnings and ultimately terminated her employment. Plaintiff, however, now concedes that she can not establish a claim under the FMLA. Furthermore, plaintiff admits that she "does not think that race played any role in the company's decision" to issue the verbal or written warnings or to terminate her but, instead, plaintiff believes that defendants' actions were "all about [her] disability." Therefore, plaintiff's only remaining claims are those under the ADA and the court considers all other claims abandoned.

Defendants argue that the ADA claims are barred because plaintiff failed to verify properly and/or amend timely her EEOC charge of discrimination. It is undisputed that plaintiff did not verify properly her original EEOC charge filed on January 2, 2008. Plaintiff, however, cites an amended charge, verified by her lawyer, on March 25, 2008.

The March 25 amended charge was filed after the EEOC already had issued a Notice of Right to Sue. Once the EEOC has issued a right to sue letter and closed its file, an amendment cannot relate back to the date of the original filing because there is no longer a charge in front of the EEOC to amend. <u>See</u> <u>Butler v. Greif, Inc.</u>, 1:07cv1978-ODE (N.D. Ga. Sept. 26, 2008), <u>affirmed</u> Case No. 08-16104 (11th Cir. April 8, 2009); <u>Balazs v. Liebenthal</u>, 32 F.3d 151, 156-58 (4th Cir. 1994). Despite plaintiff's arguments to the contrary, this court will follow the legal guidance set forth by the Eleventh Circuit Court of Appeals. Therefore, as plaintiff failed to properly verify her charge and an EEOC charge is a prerequisite to filing suit, plaintiff's claims that defendants violated the ADA must fail. Even if plaintiff's EEOC charge was proper, the court, as discussed below, finds that plaintiff fails to point the court to evidence which would support a finding of disability discrimination.

<u>ADA Standard</u>

The ADA provides that no covered employer shall discriminate against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Furthermore, the ADA imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A).

To establish an ADA violation, a plaintiff may use circumstantial evidence according to the traditional Title VII burden-shifting analysis. Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824, 93 S. Ct. 1817, 1824-25 (1973).

To establish a *prima facie* case of disability discrimination, a plaintiff must show that 1) she has a disability; 2) she is a qualified individual; and 3) she was subjected to unlawful discrimination because of her disability. Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

To be protected under the ADA, an individual must have a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment or be regarded as having such an impairment. 42 U.S.C. § 12102(2)(A). Plaintiff also must show that she is a qualified individual. The ADA defines "qualified individual with a disability" as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual held. 42 U.S.C. § 12111(8). Reasonable accommodations may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations." 42 U.S.C. § 12111(9). If plaintiff is unable to perform an essential function

of her job, even with an accommodation, she is by definition not a"qualified individual" covered by the ADA. <u>Davis v. Florida Power & Light Co.</u>, 205 F.3d 1301, 1305 (11th Cir. 2000).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason of the challenged action. <u>See</u> <u>EEOC v. Joe's Stone Crabs, Inc.</u>, 296 F.3d 1265, 1272 (11th Cir. 2002). After the employer presents a legitimate, nondiscriminatory reason for its action, "the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination" in order to avoid summary judgment. <u>Brooks v. County Comm'n of Jefferson County</u>, 446 F.3d 1160, 1163 (11th Cir. 2006). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason. <u>Id.</u>

Plaintiff's amended complaint alleges that defendants regarded her as having, or alternatively, that she did have a memory impairment as a result of her brain surgery. Plaintiff's response to defendants' motion for summary judgment, however, focuses on her sickle cell condition which was not referenced in her Amended Complaint. Although plaintiff improperly attempts to redefine her disability claims in her response to defendants' motion for summary judgment, the court finds that the analysis of plaintiff's disability claims is the same under either scenario. Therefore,

for the purpose of this motion for summary judgment only, the court will presume that plaintiff has a disability.

After considering the admissible evidence, however, the court has serious doubts that plaintiff could establish that she was a "qualified individual." Since neither party specifically addressed the issue of the essential functions of plaintiff's job, the court will presume for the purpose of this motion for summary judgment only, that plaintiff has established a prima facie case.

Defendants come forward with a legitimate non-discriminatory reason for the company's actions by pointing to the feedback of the preceptors in support of its decision to terminate plaintiff. Specifically, the preceptors reported, *inter alia*, that plaintiff kept putting members on hold, had calls lasting longer than thirty minutes, was repeating instructions to members multiple times and was making multiple calls back to patients to get information. Based on this information, defendants concluded that plaintiff was not handling calls from patients in a safe and effective manner.

Plaintiff argues that defendants' reason is pre-textual because defendants chose to place plaintiff in an unreasonable situation for learning the new .gen advice system and refused to send her to the surgery department. Defendants' reasons, however, go beyond plaintiff's ability to use the new system and refer to plaintiff's interactions with the members and her ability to perform the job. While reasonable minds may differ as to the

wisdom of placing plaintiff at high call centers, this court does not sit as a "super-personnel" department. See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Although plaintiff contends that she should have been assigned to the surgery department as a reasonable accommodation (and that defendants' approach led to "unnecessary stress and confusion"), plaintiff fails to show how this assignment would do any more than allow her to have a different supervisor. Defendants point to undisputed evidence that the responsibilities of Advice Nurses in the surgery department were basically the same as those in the departments to which plaintiff was assigned. Plaintiff fails to show how working the same position in the surgery department would have had any effect on her condition or her ability to perform her job. See e.g. Lewis v. Zilog, Inc., 908 F. Supp. 931, 948 (N.D. Ga. 1995)(recognizing that transferring disabled individuals solely to allow the employee to work in a different setting or under a different supervisor is not an accommodation reasonably to be expected).

Likewise, defendants' request that plaintiff provide medical clearance after returning from surgery does not support a finding of discrimination. See 42 U.S.C. § 12112(d)(4)(an employer may ask for medical documentation that "is shown to be job-related and consistent with business necessity"). Therefore, Plaintiff fails to point to any evidence which suggests defendants' actions were

based on discrimination. Accordingly, defendants' motion for summary judgment [docket no. 61] is GRANTED.

## Summary

Defendant's motion for summary judgment [docket no. 61] is **GRANTED**.


**SO ORDERED**, this __28th__ day of September, 2009.


_____
G. ERNEST TIDWELL, JUDGE
UNITED STATES DISTRICT JUDGE